UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
CRYSTAL MARIE KIKLIS,                   )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No. 10-10699-NMG
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security         )
                                        )
            Defendant.                  )
_____)


REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND DEFENDANT'S MOTION FOR AN ORDER AFFIRMING DECISION

September 9, 2011

SOROKIN, M.J.

        The Plaintiff, Crystal M. Kiklis, seeks reversal of a decision of the Defendant, the

Commissioner of the Social Security Administration ("the Commissioner"), denying her

disability benefits, or in the alternative seeks to remand the case for further findings.  Docket #s

1, 11.  The Commissioner seeks an Order affirming his decision.  Docket # 14.

        For the following reasons, I RECOMMEND that the court DENY the Plaintiff's Motion

for Summary Judgment (Docket # 11) and ALLOW the Commissioner's Motion for an Order

Affirming the Decision (Docket # 14).

I.      PROCEDURAL AND FACTUAL BACKGROUND

On May 30, 2007, Kiklis filed an application for Disability Insurance Benefits alleging that she had been disabled since December 1, 2006. Tr. at 7. Kiklis' application was denied on July 5, 2007, without further appeal. Id. at 8. Kiklis again applied for benefits on December 5, 2007, and was again denied. Id. Her request for reconsideration of that decision was also denied on May 8, 2008. Id. On July 17, 2008, Kiklis requested a hearing before the Administrative Law Judge ("ALJ") but did not appear at the scheduled hearing. Id. Although a letter was sent to Kiklis informing her that her request for a hearing would be dismissed if she did not demonstrate good cause for her failure to appear, Kiklis did not respond and the request for hearing was dismissed on December 11, 2008, without Kiklis having made a request to vacate the dismissal. Id.

On January 17, 2009, Kiklis submitted an application for benefits which was denied for lack of insured status. Id. at 8, 132-133. Kiklis requested reconsideration but the denial was upheld. Id. at 8. Kiklis then requested and received a hearing before an ALJ at which she appeared on October 8, 2009. Id. at 79-80, 97-103. The ALJ treated Kiklis' request to re-open her December 5, 2007, application as a motion to vacate the December 11, 2008, dismissal and to treat the October 8, 2009, hearing as the hearing on the December 5, 2007, applications. Tr. at 8. The ALJ denied this motion because Kiklis did not provide good cause for failing to appear at the November 8, 2008 hearing, and because even if she had done so, her request to vacate the dismissal was not timely. Id. at 8.

The ALJ found that Kiklis's last insured day was September 30, 2007 and therefore

2

upheld the denial of the January 17, 2009, application for lack of insured status.[1] Id. at 7-8.

Furthermore, since the motion to vacate the December 11, 2008, dismissal and to re-open the

December 5, 2007, application was denied, the May 8, 2008 decision was deemed final and the

January 17, 2009 application was barred and dismissed. Id. at 8.

     In making the decision to deny Kiklis's request for disability benefits, the ALJ conducted

the familiar five-step sequential evaluation process which determines whether an individual is

disabled and thus entitled to benefits. See 20 C.F.R. §§ 404.1520, 416.920; Goodermote v. Sec'y

of Health and Human Services, 690 F.2d 5, 6-7 (1st Cir.1982); Tr. at 9.

     First, the ALJ found that Kiklis had not engaged in substantial gainful activity since

December 22, 2008. 20 C.F.R. § 416.920(a); Tr. at 11. The second step asks whether the

claimant has a medically determinable impairment that is "severe" or a combination of

impairments that is "severe". 20 C.F.R. § 416.920(c). A severe impairment is one which,

"significantly limits [her] physical or mental capacity to perform basic work-related functions."

Goodermote, 690 F.2d at 6. The ALJ determined that Kiklis had the following severe

impairments: (1) post-traumatic stress disorder; (2) depression; (3) anxiety; and (4) a

combination of obesity and lower back pain. Tr. at 11. The ALJ found that the headaches

reported by Kiklis were not severe and did not "cause any more than minimal impairment on the

claimant's ability to perform basic work activity." Id.

---

[1] Kiklis did report earnings for 2008 and therefore requests that her last insured date be extended. Tr. at 29-30. Kiklis simultaneously argues that she was not performing a substantial gainful activity during this earning period and therefore should be eligible for benefits. Id. at 31-32. The ALJ found that Kiklis's cousin allowed Kiklis to claim her earnings while the cousin worked as a caretaker for an aunt. Id. at 29-33. The ALJ found that since the 2008 earnings were not a result of Kiklis's own work, he would not extend the last insured date beyond September 30, 2007. Id. at 7.

The third inquiry asks whether Kiklis has impairments equivalent to the specific list of impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Social Security Regulations (in which case she would automatically have been found to be disabled). Goodermote, 690 F.2d at 6; Tr. at 10. The ALJ found that Kiklis's impairments were not included in the listed impairments. The ALJ considered Kiklis's mental impairments singly and in combination in deciding whether the Paragraph B criteria were satisfied. To satisfy the Paragraph B criteria, an applicant's mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or, repeated episodes of decompensation, each of extended time. 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Kiklis had mild restriction in activities of daily living, mild difficulties in social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. Tr. at 11.

Whenever, as here, there has been a determination that the claimant has a significant impairment, but not an 'Appendix 1 impairment,' the ALJ next proceeds to the fourth and fifth steps of the sequential evaluation process. At this point, the ALJ inquires whether the claimant's impairment prevents her from performing the types of work she has performed in the past, and if so, whether the claimant's impairment prevents her from performing other work found in the economy. Should the answer to either inquiry be "no", then the claimant is not disabled within the meaning of the Social Security Act. Goodermote, 690 F.2d at 6-7.

The ALJ found that Kiklis could understand and remember simple instructions, could concentrate on simple tasks for a two-hour period over the course of an eight-hour workday,

could interact appropriately with co-workers and supervisors, and could adapt to changes in the workplace. Tr. at 12. As a result, the ALJ found that Kiklis had a residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 416.967(b). Id. Based upon Kiklis's RFC, the ALJ decided that Kiklis could perform her past work as a cashier, work which would "not require performance of work-related activities precluded by her RFC." Id. at 14.

### Facts Related to Kiklis's Physical and Psychological Impairments

#### Physical Impairments

Kiklis attended school through the ninth grade. Id. at 23-24. She has worked as a cashier at Burger King, Kohl's, and a grocery store. Id. at 24-28. In the Burger King and Kohl's cashier positions, Kiklis requested a stool that she was able to use intermittently. Tr. at 27-28.

On October 15, 2007, Kiklis was seen at North Shore Medical Center ("NSMC") for abdominal pain by Dr. Shamsai, who noted that Kiklis was morbidly obese. Id. at 186. On October 27, 2007, Kiklis was seen at NSMC by Dr. Stahl for suspected scabies when she complained of back pain that became worse when she moved or coughed. Id. at 188.

On March 10, 2008, Kiklis was seen by Dr. Lopez at Lynn Community Health Center ("LCHC") for back pain that Kiklis described as mild-to-moderate in severity and involving her middle and lower back. Id. at 296. Kiklis also stated that her pain was relieved by physical therapy. Id. Dr. Lopez noted that Kiklis could achieve a lumbar angle of ninety degrees but that she experienced a slight decrease in lateral flexion due to pain. Id. at 297.

On May 28, 2008, Kiklis went to NSMC for back and chest pain. Id. at 199-200. Subsequent x-rays were normal and Kiklis was discharged in "good condition." Id.

On August 1, 2008, Kiklis saw Dr. Narang at LCHC for back pain and knee pain which

she reported experiencing since childhood.  Id. at 335.  Dr. Narang noted posterior tenderness and that Kiklis's extension and lateral flexion were normal.  Id.  On the same day, Kiklis reported to Dr. Erdmann at LCHC that she was feeling better and her dosage of Celexa was increased.  Id. at 337.

On July 9, 2009, Kiklis visited NSMC because she was experiencing back pain.  Tr. at 282-283.  Dr. Burggraf noted that Kiklis has chronic back pain and that the pain in her back was localized.  Id. at 282-283.

Psychological Impairments

On March 19, 2008, Kiklis had an initial psychiatric evaluation at LCHC by Dan Gross, a nurse.  Id. at 299- 301.  Gross noted that Kiklis felt stressed and that she was bipolar and depressed.  Id. at 299.  He concluded that Kiklis was not exhibiting any signs of psychosis, mania, or suicidal ideation.  Tr. at 299-300.

On March 24, 2008, Kiklis was admitted to NSMC for suicidal thoughts and was diagnosed with depression.  Id. at 191.  Dr. Jackson noted that Kiklis had a history of depression and bipolar disorder and cleared her for a psychiatric evaluation.  Id.

On May 7, 2008, Kiklis visited LCHC reporting that she suffered from depression, anxiety, and bipolar disorder.  Id. at 308.  Angela Wilbur, a psychologist, evaluated Kiklis and noted that she had "positive symptoms of post traumatic stress disorder."  Id.  Wilbur noted that Kiklis had not previously been formally diagnosed with any mental health conditions.  Id. Wilbur observed of Kiklis that her appearance was disheveled, that her behavior was unremarkable, that she was oriented to person, place, time, and situation, that her speech and affect were appropriate, that her mood was anxious and irritable, and that her thought processes were logical.

Id. Dr. Wilbur assigned Kiklis a Global Assessment of Functioning ("GAF") score of 46.[2] Id. at 310. When Kiklis followed up with Wilbur on May 14, 2008, Wilbur added "unspecified mood disorder" to her diagnoses and assigned Kiklis a GAF of 45. Id. at 311. Kiklis had six additional therapy sessions with Wilbur between May 19, 2008, and August 6, 2008. Id. at 317, 319, 325, 330, 332, 340. Within this time period, Kiklis was prescribed Neurontin for anxiety and for her mood. Id. at 314, 317, 319. On both May 19, 2008, and May 28, 2008, Kiklis reported an improved mood. Id. On June 2, 2008, Kiklis reported that although the Neurontin had improved her anxiety, she was having difficulty sleeping and was still having anxiety attacks. Id. at 321. Kiklis began a trial of Celexa on June 16, 2008, to treat her anxiety and depression. Id. at 327.

On July 8, 2008, Kiklis visited NSMC because of suicidal thoughts. Id. at 201-202. She was seen by Dr. Ross, who found that her medical exam was "unremarkable." Id. She was diagnosed with "possible depression," was medically cleared for a mental health evaluation and was discharged in good condition. Id.

On February 24, 2009, Kiklis had a consultative exam with Dr. Mondale of the Massachusetts Rehabilitation Commission Disability Determination Services. Id. at 210-212. Kiklis reported to Mondale that she was unable to work because she "gets very anxious and uncomfortable around people." Id. at 210. Mondale also noted that Kiklis takes care of her personal daily needs, walks to a friend's house, sees some friends in her building, and watches television. Id. at 211. Dr. Mondale diagnosed Kiklis with post-traumatic stress disorder and noted that she was alert and oriented. Id. at 212.

---

[2] The GAF is used by clinicians to rate a person's level of functioning. A GAF between 41 and 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. See Diagnostic and Statistical Manual of Mental Disorders 34 (American Psychiatric Association, 4th ed., 2000).

Between July 22, 2009 and August 24, 2009, Kiklis had four therapy sessions with Ms. Ekmekchi, a social worker at LCHC. Id. at 371-383. Ms. Ekmekchi repeated the diagnoses of post traumatic stress disorder and unspecified mood disorder made previously by Dr. Wilbur. Id. On September 23, 2009, Ms. Ekmekchi submitted a memo stating that Kiklis "suffers from post traumatic stress disorder and major depressive disorder. [She] also has difficulties concentrating and focusing [and] reports memory impairment." Id. at 428.

Reviewing Physician's Medical Opinions

On March 3, 2009, Judith Kellmer, Ph.D. conducted a mental residual functional capacity ("RFC") assessment on Kiklis and prepared a Psychiatric Review Technique form. Id. at 213-230. Dr. Kellmer found that Kiklis was: "able to understand and follow simple instructions; able to focus and concentrate at a consistent pace for short periods of a normal workday, and; able to manage the superficial social interactions of the workplace." Id. at 215. Dr. Kellmer also found that Kiklis "[w]ould do best in [a] low interaction role with [a] supportive supervisor," and that she "[c]an work in [a] low stress, predictable environment." Id. Dr. Kellmer diagnosed Kiklis with anxiety with post-traumatic stress disorder and social anxiety, and depressive disorder. Id. Dr. Kellmer also concluded that due to Kiklis's impairments, she experienced a mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Id. at 227.

On March 7, 2009, Richard Goulding, M.D. conducted a physical RFC assessment. Id. at 231-238. Dr. Goulding diagnosed Kiklis with lower back pain and obesity. Id. at 231. He found that Kiklis could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds. Id. at 232. Dr. Goulding additionally found that Kiklis could stand and/or

walk for at least two hours in an eight-hour work day and could sit for about six hours in an eight-hour workday.  Id.  Dr. Goulding also found that Kiklis could occasionally climb, balance, stoop, kneel, crouch, or crawl, and that she had no visual, manipulative, communicative, or environmental limitations.  Id. at 232-235.

On June 15, 2009, Dr. Punyamurtula Kishore, M.D. conducted a physical RFC assessment.  Tr. at 239-246.  Dr. Kishore noted that Kiklis's primary diagnosis was back pain and that Kiklis's severe obesity may contribute to her back pain.  Id. at 239-240.  Dr. Kishore reported findings that were similar to Dr. Goulding's findings except that she found that Kiklis could stand and/or walk for about six hours in an eight-hour work day.  Id. at 240.  In addition, Dr. Kishore found that Kiklis had certain environmental limitations that would require her to avoid extreme cold and hazards.  Id. at 243.

On June 16, 2009, Therese Harris, Ph.D conducted a mental RFC assessment and prepared a psychiatric review technique form.  Id. at 247-264.  Dr. Harris found that due to her mental impairments, Kiklis experienced moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, and pace.  Id. at 257.  She found that there was insufficient evidence to determine if Kiklis experienced a degree of limitation that restricted her daily living.  Id.  Dr. Harris also concluded that Kiklis was "able to recall and manage simple tasks; able to maintain focus, pace, and persistence for simple tasks for two hour periods within a normal work schedule; able to manage appropriate, superficial interpersonal interactions in the workplace, and; able to adapt to minor changes in work demands."  Id. at 263.

The Vocational Expert's Testimony

A vocational expert, Mr. Goldfarb,[3] testified during Kiklis's hearing before the ALJ.  Id. at 51-56.  Goldfarb classified Kiklis's past positions as a cashier as light and unskilled and also noted that the job was done at the sedentary level "a majority of the time".  Id. 51-52.  Goldfarb classified her past position as a fast food worker as light and unskilled.  Id. at 52.  The ALJ then asked Goldfarb whether a hypothetical individual of Kiklis's age and work history, and with the limitations described by the reviewing physicians in their RFC's could perform Kiklis's past work.  Id.  Goldfarb testified that the hypothetical individual could perform Kiklis's past work. Id.  Goldfarb then gave examples of possible jobs that the hypothetical person could perform such as a bottling attendant which is light and unskilled, and a table worker which is sedentary and unskilled.  Id. at 53.

II.     DISCUSSION

In seeking reversal, Kiklis contends that the ALJ (1) failed to evaluate all medical evidence; (2) failed to accord adequate weight to the opinions of treating medical providers; (3) failed to properly assess Ms. Kiklis's residual functional capacity; (4) incorrectly relied upon vocational expert testimony which was based upon incomplete hypotheticals; and (5) improperly refused to vacate Ms. Kiklis's December 11, 2008 dismissal of a prior hearing request.  Docket #11-1 at 1-2.

Standard of Review

The District Court may enter a judgment affirming, modifying, or reversing the Commissioner's decision (with or without remanding the rehearing) but the Court may not disturb the Commissioner's findings where they are supported by substantial evidence.  42

_____

[3]  The record does not reveal Mr. Goldfarb's first name.

U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. Rodriguez v. Sec'y of Health and Human Services, 647 F.2d 218, 222 (1st Cir.1981). Determinations of credibility and the resolutions of conflicts in the evidence are for the Commissioner and not for the doctors or for courts. Id. Although an administrative record might support multiple conclusions, a court must uphold the Commissioner's findings wherever a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support them. Irlanda Ortiz v. Sec'y of Health and Human Services, 76 F.3d 15, 16 (1st Cir.1996). Similarly, a denial will not be upheld where the finding of the Commissioner is not supported by substantial evidence, id.; 42 U.S.C. § 405(g), or if there has been an error of law in the evaluation of the claim. See Manson-Pizarro v. Sec'y Health & Human Services, 76 F.3d 15, 16 (1st. Cir.1996).

Evaluation of the Medical Evidence

Kiklis claims that the ALJ failed to properly evaluate the medical evidence because he ignored Dr. Wilbur's evaluations of Kiklis between May 7, 2008 and August 6, 2008, ignored the GAF that Dr. Wilbur assigned to Kiklis on May 7 and 14, 2008, and ignored certain information that Dr. Mondale noted in his evaluation of Kiklis on February 24, 2009.

Substantial evidence must support the ALJ's decision and when so supported, the ALJ's factual findings are conclusive. However, they "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir.1999). Nonetheless, the "failure to address a specific piece or pieces of evidence [do] not undermine the validity of the ALJ's conclusion, for example, when that conclusion was supported by citations to substantial medical evidence in the record and the

unaddressed evidence was either cumulative of the evidence discussed . . . or otherwise failed to support the claimant's position." Coggen v. Barnhart, 354 F.Supp.2d 40, 55 (D. Mass.2005) (Young, J.).

In this case, the ALJ does refer to Dr. Wilbur's medical report in evaluating the intensity, persistence, and limiting effects of Kiklis's ability to do basic work activities. Id. at 13. The May 7, 2008 report lists twenty-one observations about Kiklis's mental status, a majority of which are unremarkable. Id. at 310. Kiklis complains that the ALJ does not address the observation that she was disheveled or had problems with her appetite. The ALJ need not address every medical observation as long as substantial evidence in the records supports his decision. Kiklis also complains that the ALJ does not note the observation of mild dissociations or hallucinations. This observation is not consistent with Dr. Mondale's February 24, 2009 report, stating that Kiklis's possible hallucinations were attributed to the fact that "she is somewhat hypervigilant to threats and what may be going on around her." Tr. at 212. The additional medical reports provided by Dr. Wilbur offer notes from therapy and comments on mood, and are very similar, indicating that the information is cumulative of the evidence discussed.

Kiklis argues that the ALJ also ignored the GAF that Dr. Wilbur assigned to her. The Social Security Administration has found that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." 65 Fed. Reg. 50746, 50764-65 (August 21, 2000). A person's GAF does not necessarily dictate the type of work that they are able to do. See Robert v. Astrue, 688 F.Supp.2d 29, 38 (D.Mass.2010) (a GAF of 50 does not necessarily mean that a person cannot meet the basic mental demands of competitive

remunerative unskilled work); See also Querido v. Barnhart, 344 F.Supp.2d 236, 246

(D.Mass.2004) (a GAF of 45 and 50 did not undermine the ALJ's residual functional capacity

finding of moderate mental limitations).  Kiklis's GAF scores of 46 and 45 do not necessarily

have a direct correlation to the type of work that she is able to do and therefore the fact that the

ALJ did not accord it "much" weight does not undermine the decision.  Moreover, the ALJ found

that the GAF was not supported by the clinical findings provided.  Id. at 14.

Kiklis also argues that the ALJ ignored parts of Dr. Mondale's evaluation.  The ALJ

refers to Dr. Mondale's evaluation when he is determining whether the paragraph B criteria are

satisfied.  In order to determine whether the claimant's impairments meet or medically equal the

criteria of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (as required in step

three of the five step disability evaluation process described above), the ALJ asks whether the

mental impairments result in two of the following: marked restriction of activities of daily living,

marked difficulties in maintaining social functioning, marked difficulties in maintaining

concentration, persistence, or pace, or repeated episodes of decompensation, each of extended

duration.[4]  Id. at 11.

The ALJ relied upon Dr. Mondale's evaluation for specific evidence supporting the level

of difficulty that he assigned to Kiklis.  The ALJ found that Kiklis experienced a mild restriction

in activities of daily living based on the facts that Kiklis takes care of her personal needs, walks

to a friend's house, and watches television.  Id. at 11; 210-212.  This is consistent with Dr.

Kellmer's finding in the Psychiatric Review Technique.[5]

---

[4] Kiklis did not experience any episodes of decompensation according to her medical
records.

[5] Although Dr. Harris conducted a Psychiatric Review Technique as well, she found that
there was insufficient evidence to determine whether Kiklis experienced any difficulties in the

In terms of social functioning, the ALJ found that Kiklis experienced mild difficulties. Importantly, the ALJ recognized that Dr. Mondale's evaluation stated that Kiklis experienced anxiety around people, but found that in the area of social functioning, there was "nothing in the record establishing any limitations in this area other than the claimant's subjective allegations." Id. at 11; 210-211. This finding is less severe than the degree of difficulty assigned by Drs. Kellmer and Harris (See Id. at 227 and 257 respectively), but the ALJ found that there was not substantial evidence in the record to support a moderate finding. In addition, even if the ALJ did find that Kiklis experienced moderate difficulty in social functioning she would still be unable to meet the requirement of two categorical findings of "marked".

Finally, the ALJ found that Kiklis experienced moderate difficulty with concentration, persistence, and pace. To support this finding, the ALJ referenced Ms. Ekmekchi's memo noting her difficulty concentrating due to post-traumatic stress disorder. Id. at 428. The ALJ does add that the Kiklis's ability to watch television is indicative of her ability to concentrate. Id. at 12. Kiklis argues that the ALJ used a layperson's interpretation here to conclude that there was additional evidence supporting a moderate finding. While the ALJ's argument appears to be unfounded, a more severe finding in this area would not assist Kiklis in meeting the Paragraph B criteria. Additionally, this finding was consistent with those of Drs. Kellmer and Harris. Id. at 227 and 257. While the ALJ did not address all aspects of Dr. Mondale's evaluation, he noted key observations that summarily presented Dr. Mondale's findings. The ALJ considered Kiklis's anxiety around people as noted by Dr. Mondale and the ALJ's conclusions reflected the impact of these impairments. The ALJ did not ignore Dr. Mondale's evaluations and the Paragraph B

_____

area of daily living activities.

findings were supported by substantial evidence.

<u>Weight Accorded to the DDS assessments</u>

The ALJ stated that he "accord[ed] weight to the DDS assessments." <u>Tr.</u> at 14. Kiklis argues that the ALJ should have given controlling weight to Kiklis's treating physicians, Dr. Wilbur and Ms. Ekmekchi. The ALJ "may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." <u>Castro v. Barnhart</u>, 198 F.Supp.2d 47, 54 (D.Mass.2002) (Swartwood, M.J.).

Here, the ALJ does not go so far as to reject Dr. Wilbur and Dr. Ekmekchi's evaluations. Rather, the ALJ refers to the memorandum submitted by Ms. Ekmekchi regarding Kiklis's psychological impairment and her ability to concentrate and also refers to Dr. Wilbur's evaluation of Kiklis when analyzing Kiklis's psychiatric limitations. <u>Id.</u> at 13. Neither Dr. Wilbur nor Ms. Ekmekchi made any observations regarding Kiklis's ability to work. The medical records offer insight into the therapy sessions that Kiklis began with each provider, but they do not provide any medical opinions regarding any psychological limitations in the workplace. The ALJ does not reject findings from Dr. Wilbur and Ms. Ekmekchi as inconsistent with substantial evidence in the record and therefore reject the evidence altogether. The ALJ does not dispute the diagnoses offered by Dr. Wilbur and Ms. Ekmekchi, but these providers do not offer any opinions as to regarding the type of work Kiklis could do, the environment that she could work in, the restrictions or limitations that her psychiatric impairments place on her, etc. Had the providers given more insight into the effect that Kiklis's impairment had on her ability to

work, the opinions would have been more relevant and may have been accorded additional weight.

Evaluation of Kiklis's RFC

Kiklis argues that the ALJ did not properly evaluate her RFC because (1) an examining medical expert did not make an RFC interpretation of the raw medical evidence; and (2) the ALJ did not provide a "function-by-function" analysis and a narrative discussion for the RFC.  The RFC is described as "the most [the claimant] can still do despite [any] limitations."  20 C.F.R. § 404.1545(a)(1).  The claimant is "responsible for providing the evidence [used] to make a finding about [the RFC]."  20 C.F.R. § 404.1545(a)(3).  Any statements about what the claimant can still do that have been provided by medical sources, whether or not they are based on formal medical examinations, are considered.  Id.  "If [the claimant's] case is at the administrative law judge hearing level…the administrative law judge . . . is responsible for assessing [the] residual functional capacity."  20 C.F.R. § 404.1546(b).

According to the regulation, the ALJ must determine Kiklis's RFC.  The law does not require that a medical expert determine the RFC based upon the raw medical data.  Kiklis cites to two cases to support her argument that a medical expert should have determined Kiklis's RFC instead of the ALJ.  These cases are distinguishable.  In Rivera-Figueroa v. Sec'y of Health and Human Services, the ALJ had assessed the plaintiff's limitations without any RFC questionnaires to guide him.  Rivera-Figueroa v. Sec'y of Health and Human Services, 858 F.2d 48 (1st Cir.1988).  This is not true in this case.  Drs. Kellmer and Harris provided Mental RFC Assessments and Drs. Goulding and Kishore provided physical RFC assessments.  Tr. at 213-216; 231-246; 261-264.  In addition to these assessments, the ALJ also drew from the evaluations

from Drs. Mondale and Wilbur. Kiklis also cites to <u>Gordils v. Sec'y of Health and Human Services</u>, 921 F.2d 327, 329 (1st Cir.1990), in which the Court states that the ALJ may not determine an RFC based on "bare medical findings." The <u>Gordils</u> court adds, however, that "this principle does not mean, however, that the [ALJ] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment." <u>Id.</u> The RFC assessments paired with Dr. Mondale and Dr. Wilbur's evaluations provided the ALJ with sufficient evidence to render such a common sense judgment regarding Kiklis's RFC.

Kiklis also argues that the ALJ failed to provide a "function-by-function" assessment and a narrative discussion regarding Kiklis's RFC pursuant to SSR 96-8P, 1996 WL 374184 (July 2, 1996) at 1 and 7. The ALJ does provide a "function-by-function" assessment of Kiklis's RFC by breaking down her physical abilities as occasionally being able to climb, balance, stoop, kneel, crouch, or crawl. <u>Tr.</u> at 12. The ALJ also states that Kiklis must avoid "concentrated exposure to extreme cold and hazards." <u>Id.</u> With regards to her psychological abilities, the ALJ found that Kiklis could "understand and remember simple instructions, concentrate for two hour periods over an eight hour workday on simple tasks, interact appropriately with co-workers and supervisors, and adapt to changes in a work setting." <u>Id.</u> <u>See also</u> <u>Depover v. Barnhart</u>, 349 F.3d 563, 567 (8th Cir. 2003) (when the ALJ has made "explicit findings" and "did not simply describe the RFC in general terms," the function-by-function requirement was satisfied). In this case, the ALJ has made explicit findings regarding Kiklis's specific functional abilities, both physical and psychological; <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005) (as long as the ALJ takes into account the "limitations for which there was record support that did not

depend on [the claimant's] subjective complaints" in determining the claimant's RFC, a "function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record" was not required).  Moreover, the Court rejects Kiklis's assertion that "relied on a flawed assumption that the claimant had past relevant work as a cashier."  Although the ALJ does not make a specific finding concerning the sufficiency of length of Kiklis's work as a cashier, there is substantial record evidence from which the ALJ could reasonably have concluded that Kiklis had past relevant work as a cashier.

<u>Vocational expert's testimony</u>

Kiklis also argues that the ALJ incorrectly relied upon the vocational expert testimony which was based on incomplete hypotheticals.  The ALJ must base his hypothetical on a substantially supported assessment of the claimant's functional limitations when obtaining testimony from the vocational expert.  <u>Coggen</u>, 354 F.Supp.2d at 61; <u>Rose v. Shalala</u>, 34 F.3d 13, 19 (1st Cir.1994).  A vocational expert's responses are relevant only in response to hypotheticals that correspond to the medical record.  <u>Arocho v. Sec'y of Health & Human Servs.</u> 670 F.2d 374, 375 (1st Cir.1982). "[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." <u>Id.</u>

In this case the ALJ offers three variations of a hypothetical that were substantially supported by the functional limitations noted in the medical record.  First the ALJ asked the vocational expert to consider the following:

". . . [A] person who is . . . 23 years old, ninth grade education . . . has the work history as the cashier.  Let's assume this person could perform work at the light exertion level with only occasional climbing, balancing, stooping, kneeling, crouching, or crawling.  The person would need to avoid concentrated exposure to extreme cold and to hazards.  And

let's assume this person could understand and remember simple instructions, could concentrate for two hour periods over an eight hour day on simple tasks, could interact appropriately with co-workers and supervisors, and could adapt to simple changes in the workplace or work setting." <u>Tr.</u> at 52.

In response, the vocational expert testified that a person with these traits would be able to do light, unskilled work such as a bottling attendant. <u>Id.</u> at 53. The vocational expert went on to find that such an individual could also work as a table worker if the classification was sedentary and unskilled. <u>Id.</u>

The ALJ then altered the hypothetical slightly by adding that the person could not interact with co-workers or supervisors or the general public for two-hour periods over an eight-hour day. <u>Id.</u> at 53. To this, the vocational expert responded that there was no occupation that the person could perform. Finally, the ALJ altered the hypothetical once more by stating that the person should avoid frequent contact with the general public in a work setting. <u>Id.</u> at 54. The vocational expert found that this would pose no limitation on the person's ability to perform the light, unskilled work of a bottling attendant or the sedentary, unskilled work of the table worker. <u>Tr.</u> at 54.

The ALJ used parameters suggested by Dr. Harris and Dr. Kellmer when constructing these hypotheticals. For example, Dr. Kellmer suggested that Kiklis could understand and follow simple instructions, focus and concentrate at a consistent pace for short periods of a normal workday, and manage superficial social interactions at the workplace. <u>Tr.</u> at 215. Dr. Harris found the same, as well as her ability to adapt to <u>minor</u> changes in work demands. <u>Id.</u> at 263. Kiklis argues that the ALJ should not have described the workplace changes as "simple." The change is insignificant in constructing the hypothetical. The ALJ presented a hypothetical that was a substantially-supported assessment of the claimant's functional limitations and therefore

the vocational expert's testimony is relevant and properly relied upon.

<u>Refusal to Vacate the Dismissal of Kiklis's Hearing Request</u>

Kiklis's final argument is that the ALJ should have vacated the December 11, 2008, dismissal of the hearing request. Kiklis bases her argument on the Policy Interpretation Ruling, SSR 91-5p, set forth by the Social Security Administration. The purpose of the ruling is to "avoid the improper application of res judicata or administrative finality when the evidence establishes that a claimant lacked the mental capacity to understand the procedures for requesting review." SSR 91-5p, 1991 WL 208067 (July 1, 1991) at 1. The claimant lacks mental capacity to establish good cause when the evidence establishes that she could not understand the procedures for requesting review. <u>Id.</u> at 2. In deciding whether or not the claimant lacked the mental capacity to understand the procedure for requesting review, the court must consider literacy level, ability to speak English, limited education, and mental capacity that would limit the claimant's ability to do things for herself. <u>Id.</u> Finally, the court is to resolve any reasonable doubt in favor of the claimant. <u>Id.</u>

Kiklis makes a strong case that the decision denying her motion to vacate the dismissal was error under the law, or at least a decision requiring further factual development. The record indicates that, at the relevant time, Kiklis was living in a shelter or homeless, that she was unrepresented (even by the non-attorney representing her on the December 22, 2008 application), and, according to an employee of Social Security, unable to read or prepare, on her own, the motion to vacate. Tr. at 139. Nonetheless, any error is harmless. The decision denying the December 22, 2008 decision was made on the "merits" of whether Kiklis' qualified as disabled under the law. Kiklis has cited no evidence nor advanced any argument that the decision not to

reopen the 2007 application affected, in any way, the disability determination Social Security made on the 2008 application. Regarding the January 17, 2009 application, Kiklis lacked the necessary insured status and reopening the earlier application would not have changed that status. See 20 C.F.R. § 404.131.


III.    CONCLUSION

For the foregoing reasons, I RECOMMEND that the court DENY the Plaintiff's motion for Judgment on the Pleadings (Docket # 11) and ALLOW the Commissioner's Motion for an Order Affirming His Decision on Plaintiff's Disability Claims (Docket # 14).[6]


          /s / Leo T. Sorokin
          UNITED STATES MAGISTRATE JUDGE

---

[6] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir.1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir.1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir.1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir.1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir.1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).